HOPKINS *v.* WILLIAMS.

4-8869                                                          219 S. W. 2d 620

Opinion delivered April 18, 1949.

*Ernest Briner*, for appellant.

*Kenneth C. Coffelt*, for appellee.

GRIFFIN SMITH, Chief Justice. The trial Court was asked to reform a deed by which Alice V. Hopkins conveyed to J. L. Williams Lots 1, 2, 3, 4 and 5, 23 and 24, Block Two, Vimy Ridge.[1]

---

[1] What is now known as Vimy Ridge was formerly the Town of Germania.

Mrs. Hopkins, (Alice Smith before her marriage) bought Lots 1 to 10, inclusive, and Lots 23 and 24, in 1942. At trial she admitted that Lots 23 and 24 were properly conveyed to Williams, but in substantiation of her allegations of mutual mistake asserted that ". . . We had ten lots, and [Williams] got the east half and I got the west half." She also stated that shortly before the deed was made she had started building a new four room house, and that when she sold she moved into the unfinished building. The lots extend east and west. "That," said Mrs. Hopkins, "gives me the west side and [Williams] the east side. He got the seven with the building, and I got five." The lots Mrs. Hopkins "retained" are next to the railroad. Certain improvements were made on a residential plot she used for seven or eight months. A "car barn" was constructed for accommodation of an automobile during the winter. Mrs. Hopkins had been told that property in Vimy Ridge "was all messed up" in respect of lot numbers, so before selling she had been warned to identify corners and

agree on descriptions. Before closing the contract with Williams Mrs. Hopkins went on the property with him. As a result, "he thoroughly understood that the lots would be divided between us." According to Mrs. Hopkins, a part of the work of designation included putting iron stakes in the ground, ". . . and we decided the middle of the road was the dividing point, and I told him so many times, —told him that 'regardless of where it is, I get half of those ten lots, and you get half.' "

In his brief counsel for appellant says the only controversy is whether Mrs. Hopkins sold Lots 1, 2, 3, 4 and 5, or the east half of Lots 1 to 10, inclusive. The testimony is undisputed that in 1942 she paid $2,500 for all of the realty. A store building was on Lots 23 and 24, but there is no issue regarding them or the store building. In selling to Williams, Mrs. Hopkins was paid $3,500 for the real property and $500 for a stock of merchandise. She had made some improvements, including butane gas equipment, five stoves, and some store fixtures. These, she thought, had cost $1,000.

Williams, while not denying that before buying he discussed in general terms what area would be included, testified that the dwelling house, built "approximately on Lot 2," was mentioned as a part of the conveyance, for Mrs. Hopkins, in the conversations, said "the store and dwelling." There was no reference to a division of the lots. Being anxious to get possession of the merchandise as quickly as possible, Williams, knowing that residential property was hard to procure, agreed that Mrs. Hopkins might remain in the unfinished house, and permissively she temporarily retained it. During that period she had the so-called car barn constructed. It was built of 1x6's, with cheap paper for a siding— "just a shed, not a car barn."

Fill Sanders testified that he had known the property for many years and tried to buy what Mrs. Hopkins "had remaining" after she had dealt with Williams. He believed Mrs. Hopkins "thought she had retained one house and five lots." When the witness went to Wil-

liams, the latter undertook to point out the lines, indicating that he did not then claim to have purchased that part of the property upon which the residence was situated.

Much of Sanders' testimony was hearsay and wholly inadmissible, but the record does not show it was objected to. It is certain, however, that a plat, blueprint, or chart of some kind was before the Court, and that locations around which the testimony centered were identified. This plat has not been brought forward, and we must assume that the Chancellor understood it. With us there is unlimited uncertainty. The effect of Sanders' testimony substantiates assertions by Mrs. Hopkins that Williams knew what land was being bought, but when he found (as a result of conversations with Sanders and by reference to plats and an abstract) that the definite descriptions contained in the deed conveyed *all* of the property owned by Mrs. Hopkins in that area, he concluded to keep what the deed called for.

There was testimony that Williams' son tried to buy from Mrs. Hopkins the house she occupied after selling to appellee, and that discussions concerning the property took place after the deed had been executed, and with Williams' knowledge and participation. But Williams flatly denied the substance of Sanders' testimony, and explained that his son was trying to buy Mrs. Hopkins' furniture, and not the house. Insofar as descriptions, lines, boundaries, definite location of buildings, corners, iron stops, etc., are concerned, the record testimony is indefinite, although it was no doubt understood by the Chancellor. In these circumstances we defer largely to the Court's conclusions regarding matters ambiguous in print.[2] *Smith* v. *Magnet Cove Barium Corporation*, 212 Ark. 491, 206 S. W. 2d 442.

[2] An illustration of the difficulty an appellate Court has in determining place, area, and focal points from a printed record from which the plat has been omitted is shown by the following testimony, brought out on cross-examination of Sanders: Q. "You said you were familiar with *that* land *over there?*" A. "Yes, sir." Q. "I will ask you if *this* is a true representation of the way those lots run?" A. "Yes, sir, that is just exactly the way they lay." Q. "*Here* are Lots 23 and 24—no question about those two lots?" A. "The store sits right *in here* on one of *these two lots.*" Q. "Now *here* are Lots 1, 2, 3, 4 and 5?" A. "That's right." Q. "You said Mr. Williams pointed out *this* line:

There is no contention that Williams had anything to do with preparation of the deed. On the contrary, Mrs. Hopkins testified that "I got *her* to make it." There is no identification of "her" other than Mrs. Hopkins' reference to "the woman [who made it for me"]. The inference is quite clear that whatever was said or done regarding descriptions, the result complained of by appellant followed her own initiative in procuring a scrivener who either wrote the deed as directed, or mistakenly described the lots. The deed was not picked up by Mrs. Williams for two or three days. She says that when it was received and acknowledged, no examination was made. Mrs. Williams verified what her husband had testified to regarding the all-inclusive intent to buy what the deed called for.

The rule that a written instrument will not be reformed over the objections of either party unless the evidence of fraud or mutual mistake is clear and convincing has been repeatedly emphasized. *Corey* v. *The Mercantile Insurance Co. of America*, 205 Ark..546, 169 S. W. 2d 655. In the case before us the trial Court might have thought the evidence preponderated in favor of appellant, but that it was not sufficiently convincing to justify the radical changes contended for. We are of the same opinion. If the Chancellor had believed Sanders' testimony and had rejected what Williams said regarding conversations, we would have a substantial basis for appellant's insistence that the mistake was mutual. No disinterested testimony of a persuasive nature tends to show that Williams intended to buy divided lots. It follows that the decree must be affirmed.

---

didn't he point out *this* line: between 5 and 6?" A. "No, sir. Here sits the store: he wasn't out *there.* He was out *here*—this little house sits right here. . . . I am positive. I came up here and drew the plat just like *this.* . . . The store sits right *here.* We walked out *there.* I said [to Williams] 'I want to find out right where you bought to, so I will know how close the line runs here.' He said, 'I don't know where the line is: I haven't had it run.' He pointed to an iron stob as the corner, where Mrs. Hopkins said that was the corner. He said *this* line comes right through here. . . ."