CITY OF FORT SMITH, Arkansas *v.* CHARLEY FRANCE et al

5-5452 465 S. W. 2d 315

Opinion delivered March 29, 1971
[Rehearing denied May 3, 1971.]

*Shaw, Jones & Shaw,* for appellant.

*Floyd Rogers* and *David O. Partain,* for appellees.

J. FRED JONES, Justice. This is an appeal by the City of Fort Smith from an adverse decree of the Crawford County Chancery Court in an action brought by the city to quiet its title to part of a 40 acre tract of land in Crawford County. Charley France was the pri-

mary defendant in the trial court. He had conveyed small parcels of the land in controversy to the other appellee-defendants and they all claim title by adverse possession. The chancellor confirmed title in Charley France and his wife and in their grantees. On appeal to this court the city relies on the following points for reversal:

"The trial court erred in finding that appellees had acquired title by adverse possession.

The trial court erred in overruling appellant's motion objecting to entry of judgment and for a new trial."

Without benefit of abstract of any of the exhibits, the facts of record appear as follows: On May 18, 1935, the City of Fort Smith purchased from Andrew France and Lula France, his wife, several tracts of land in Crawford County in connection with the creation of Lake Fort Smith and Shepherd Spring Lake as a source of water supply for the city. The city acquired, by purchase and by eminent domain, some 10,000 acres for the entire project, but that portion of the land in controversy lies along Clear Creek between the two lakes and is described in the warranty deed of conveyance as follows:

"The Fractional Southwest Quarter of the Northwest Quarter of Sec. 30, Twp. 12 N., R. 29 W., except that part of said tract lying West of a bluff crossing said tract in a Northeasterly and Southwesterly direction."

While not germane to the issue here, but to emphasize the vagueness of description, this deed also conveyed the fractional west half of the southwest quarter of the same section with certain exceptions; one of which is as follows:

"Beginning at the Southeast corner of Southwest Quarter of Southwest Quarter of Sec. 30, Twp. 12 N., R. 29 W., thence West to Frog Bayou (Clear

Creek) thence along said stream in a Northerly direction *to a certain slough, thence along said slough crossing another slough and cornering at a certain Box Elder Tree, thence in an easterly direction passing a certain Elm Tree to East line of said SW¼ of SW¼,* thence south to place of beginning, containing 20 acres, more or less." (Emphasis added).

The deed also contains language as follows:

"And because there are indefinite descriptions in our chain of title we hereby grant and quit claim to the City of Fort Smith, its successors and assigns, but without warranty of any kind all our right, title and interest in and to the following: * * * all that part of Southwest Quarter of Northwest Quarter * * * lying East of a bluff which crosses said Southwest Quarter of Northwest Quarter * * * in a Northeasterly and Southwesterly direction."

After the City of Fort Smith purchased the property in 1935, it caused to be erected, through a W.P.A. project, a fence more or less parallel with the bluff referred to in its deed. The face of the bluff apparently deviates to some extent from vertical inaccessible rock cliffs to steep areas where a person or an animal could go up or down but a vehicle of conveyance could not. Apparently an old road at one time ran along the foot of the bluff. The bluff did not run in a straight line; it jutted out at some places more than at others, but it was apparently well defined across the 40 acre tract here involved. The fence erected by the W.P.A. for the City of Fort Smith was erected in more or less a straight line east of the bluff and averaging about 150 feet from the face of the bluff.

On April 2, 1956, Lula France, as an unmarried person, conveyed by warranty deed to Charley France and Nellie France, his wife, land described as follows:

"All that part of the Southwest Quarter of the Northwest Quarter of Section 30, Township 12 North of Range 29 West, which lies East of the

Shepherd Springs Road as now located over and across said forty and North of that part of said forty owned by the City of Fort Smith, Arkansas and that part of the said forty owned by Joe C. Bennet and others. Said deed to Joe C. Bennet as described in records office of the Recorder of Crawford County in deed record Book 178 at page 52. This deed conveys to the Grantee all interest in the above described land not already owned by her."

In 1966 Charley France and wife conveyed by warranty deeds to Smith and to Morris two small plots 50 by 100 feet in dimension and apparently lying within the area between the fence and the bluff claimed by the city. About this same time Charley France bulldozed a road from the top of one end of the bluff down into the old road near the foot of the bluff, whereupon the City of Fort Smith filed a suit in ejectment but dismissed it without prejudice and brought the present action to quiet its title. Charley France, Smith and Morris pleaded adverse possession for more than seven years. The chancellor found in favor of France, Smith and Morris and decreed title in them by adverse possession. The chancellor who heard the testimony, made his findings of fact and conclusions of law but died before the decree was actually entered thereon. The city's motion for a rehearing was denied and the decree was entered by the newly elected chancellor on the findings and conclusions of the chancellor who heard the case.

## THE APPELLEES' EVIDENCE

Logan France, a brother of the appellee, Charley France, testified that he actually made the deal for the sale of the land from his parents to the City of Fort Smith and that his father and mother sold approximately 100 acres of land to the city out of the 160 acre tract they owned. He says that at the time of the sale the City of Fort Smith simply wanted 100 acres of the bottom land, and that in 1936 the city established its fence on what was supposed to be its west boundary line. He testified that none of the land was ever

surveyed prior to the erection of the fence and that his mother and father, while living in a house on top of the bluff, continued to use the property between the bluff and the fence for cow and calf lots and to impound their other livestock. He testified that his brother, Charley, lived on the same property with his mother and father and that after his father's death in 1952, Charley continued to use the property in the same manner as used by his father and mother and had continued to so use it until the present time. He testified that when the fence was built, the city fenced in the county road which was rerouted along the top of the bluff, and that his father connected fences across the old county road for the city, and so he could have fences connected from the bluff to the city fence on the south end and also on the north end of the property involved. He testified that some bulldozing was done by Charley on a road under the bluff about seven or eight years ago. He testified that Charley lives approximately 300 feet from the north line of the property in question; that his brother, Charley, used the property even before his father passed away in 1952, and that he has continued to use it for livestock pens ever since. He testified that his mother lived in a little house by the side of Charley's house on the top of the bluff, and that there was a trail leading down from Charley's house to the property between the bluff and the fence where the livestock was kept. He testified that the trail had been in use for more than 40 years, and that he traveled it in going to school when he was a child. He testified that a part of the property in question was planted in corn in 1935 and that the city built the fence diagonally through the field where the corn was planted.

Mr. W. F. Wright testified that he had lived in the area of this property for 62 years; that he farms, raises chickens and cattle, and does some veterinary type work at times. He testified that about in 1960 he was requested to administer a milk fever shot to one of Charley France's milk cows and that he did so. He testified that the cow was penned in a lot between the bluff near Charley's house and the city reservoir fence, and he believes Charley had some other livestock in the lot. He

testified that he was familiar with the area between the bluff and the city fence and that it has been in constant use by Charley France and his family through the years.

On cross-examination this witness testified that he had rented land for a period of five or six years from the city for cow pastures inside the fence, but not between the fence and the bluff. He testified that he knew there had been some bulldozing work done on the property in the past years; that his nephew, Lee Wright, did some dozing work for Charley France on the property several years ago.

Mr. Burton Vaught testified that he lives in Mountainburg, is 49 years of age, grows broilers and is president of the school-board in Mountainburg. He testified that he is well acquainted with the property involved, and that the fence built by the city runs 100 to 150 feet from the bluff, depending on the way the bluff "winds down through there." He testified that Charley France kept livestock in a lot below his house between the bluff and the fence; that he kept milk cows in the lot; that Charley had a mule in the lot at one time; that he purchased a horse from Charley in 1960 or 1961, maybe 1959, and that the horse was in the lot between the bluff and the fence. He testified that the lot was enclosed by fences across each end of the strip between the bluff and the fence the city built. This witness testified that he purchased the horse for the purpose of skidding logs; that his brother purchased all of the timber on the reservoir area from the City of Fort Smith, and that he did the logging of the timber his brother had purchased. He testified that the city caretaker for the reservoir property showed him the property lines where he was to cut timber. He says that the fence along the lake under the hill was pointed out to him as the property line; that he was told he could cut anything inside the fence for that belonged to the city, but that he was to cut nothing outside the fence.

On cross-examination this witness testified that he was fairly familiar with all the 10,500 acres the city owns around the lakes and that at one time all the city

land was either fenced or had posts around it. He testified that the caretaker told him that,

> "Anything inside that fence was city property. * * * said just cut inside the fence—its all city property. I said—'is there any danger getting on anybody elses up there?' And he said, 'Not so long as you stay under the fence.' "

One of the appellees, Charley France, testified that he lives on the bluff overlooking the property involved; that there is a road as well as a footpath, or trail, from where he lives down through the property. He testified that the property was deeded to him by his mother in April, 1956. He testified that his father and mother kept cattle, horses, goats and hogs on the property involved, and that he had continued to maintain the corral, or lot fences, as his father and mother had done; and had continued to keep his mules, calves and hogs enclosed on the property. He testified that he had a Mr. Lee Wright do some bulldozing on the property several years ago, and that he would estimate that it was about 12 or 15 years ago. He testified that the road came up from around the end of the bluff and extended through the distance of the 40 acre tract. He testified that he had this entire road worked with a bulldozer by Mr. Wright; that Mr. Wright "just brought the bulldozer down the hill and through the land to the end and fixed the road better than it was." He testified that after Mr. Wright did the bulldozing work he had the road worked with a bulldozer two other times; once by Bobby Joe Centers and once by Buck Fath. He testified that after the bulldozing work was done he planted some crops on one end of the area, and that he has used the property constantly since his mother deeded it to him.

On cross-examination Charley France testified that Bobby Centers worked the road about three years ago. He testified that his mother and father put fences in from the bluff to the fence built by the W.P.A. on each end of the land involved; that he continued to maintain the fences and use the property between the bluff and the W.P.A. fence. He testified that in maintaining the

road Mr. Centers may have pushed out big rocks and some trees with the bulldozer and that Mr. Wright, some 12 or 14 years ago, did the same with his bulldozer. He says that the road has remained open and passable ever since Mr. Wright did the bulldozing work some 12 or 14 years ago. He testified that he does not know whether his father and mother had permission from the city to use the land or not, but that they continued to use it after they sold the land to the city.

Mr. Claude Morris testified that he purchased a team of mules from Charley France; that he is familiar with the property involved and that when he purchased the mules, Mr. France had them, as well as other live-stock, enclosed on the area involved. He testified that he had bought a lot from Charley in the area and had a well drilled on it. On cross-examination he testified that he had known Charley all of his life and had spent 29 days in the penitentiary with Charley for cattle rustling.

## THE CITY'S EVIDENCE

Dominic Leraris, a civil engineer, testified that he surveyed the land involved at the request of the city in 1967; that he was first on the land June 27, 1967, and that a bulldozer was working a road on the land when he was there.

Mr. Roy E. McCann, Jr., a commercial photographer, identified a number of pictures he took of the area and both he and Mr. Leraris testified that in walking over the property they encountered no fences connecting the city fence line with the bluff.

Mr. Bob Sult testified that he had been superintendent of the reservoir for the City of Fort Smith and had been in almost daily contact with the area involved since December, 1962. He testified that when he first assumed supervision of the reservoir area, it was his understanding that the property involved between the bluff and the fence line belonged to the city. He testified that it was in the Spring of 1965 when he first learned that Charley France was claiming adverse to the

city. He says that on that occasion Charley advised him that he was going to cut a road down under the bluff and he advised Charley it was city property. He says Charley responded that if anyone stopped him it would be the sheriff (this was denied by Charley who testified that he and Sult did not get along and that Sult does not advise him on anything). Sult testified that he is pretty sure it was in 1965 when Mr. Centers was on the property with a bulldozer. He says that he had a work crew place barricades across the road but they were removed. He says that they then drilled holes across the road and set steel pipes in concrete and that the pipes were removed before the concrete set up. He testified that he did not know whether Charley France moved the barricades or not, but he does know Charley had him arrested for blocking a public road.

Mr. Sult testified that he noticed an old fence running out from the bluff but that he does not believe it connects with the city fence. He testified that when he first went up into the area in 1962, Mr. Cole (a former superintendent) went with him and that Mr. Cole pointed out to him that the land between the fence and the bluff belonged to the city. This witness testified that up until this present lawsuit was started, no cattle were on the property involved during the time he had been superintendent in so far as he knows. Mr. Sult testified that Lake Fort Smith had a fence all the way around it when it was first built and that Lake Fort Smith takes in the property in question. He testified that the fence has fallen in bad repair and that he attempts to keep all the old roads leading into the area blocked and the cattle run out of the area.

Mr. John Luce testified that he had worked for the City of Fort Smith for a period of 41 years; that he was familiar with the area when Lake Fort Smith and Lake Shepherd Springs were formed, and remembers when the property in question was acquired. He testified that it was his understanding that the city was to get all of the 40 acre tract involved in this case east of the bluff. He testified that it had been his impression that the city owned this property to the bluff until the

dispute arose a few years ago with Mr. Charley France, and that he first learned of the adverse claim about 1966. He testified that it was his impression all along, as superintendent of the property involved, that the city owned and controlled the land between the bluff and the fence line. He testified that the land along the very foot of the bluff was pretty rugged; that in many instances the fences were erected along the boundary lines of the city acquisition, but that in most instances the city was not particularly interested in property boundary lines and placed its fences in the most convenient location to keep cattle and livestock out of the water supply. He testified that he first learned of the adverse claim of Charley France when the obstructions he had placed in the old Shepherd Springs Road were removed and he sent some men to the area to replace the obstructions. He testified that there was no roadway from the top of the bluff to the old road where he erected the barricades until Charley France had a roadway cut around the bluff. He testified that this was done in 1965 or 1966 (he thinks it was 1966), and that when steel pipes were put in the road they were removed. He testified that livestock should not have been permitted to run on the city property between the bluff and the fence, and that there was not supposed to be any livestock in that area. He testified that there was a caretaker already hired when he became superintendent in 1945, and that he employed two caretakers in succession. He testified that as far as he knows the caretakers knew where the city boundary lines were; that some of the fence posts burned out, and the fences fell into disrepair over the years for lack of money or personnel to replace or repair them. He testified that the area surrounding the lakes was open range area when the lakes were impounded, and that the main object of fences was to keep cattle out.

On cross-examination this witness testified that he was not superintendent at the time the fence was built; that he simply knows that a fence was built and that he surmises that the fence was to keep the cattle out of the water. He testified that he did not know how long the old road had been between the bluff and the fence. He stated an opinion that livestock could get down

from the bluff but that a wagon or automobile could not. He testified that from 1935 when the city acquired the property, until 1965 or 1966 when he saw a bulldozer on the property, that the city had caretakers in the area and that they attempted to keep cattle out of the area. He testified that he did not know that cattle were running in this area from 1935 until 1965.

Charley France on recall identified the deed from his mother to himself and wife and testified that the description contained in the deed was intended to describe all of the property owned by her in the 40 acre tract.

The discovery deposition of Mrs. Helen Sax was submitted in evidence and she testified that her husband, who is incapacitated, was the first caretaker of the reservoir area. She testified that the W.P.A. built the fence soon after the property was acquired by the city, and that there was no fence built from the bluff to the W.P.A. constructed fence.

On cross-examination Mrs. Sax testified that it had been 30 years, or a little better, since she had been to the property. She testified that the fence went around the city property and that was the purpose of the fence. She testified that it was too difficult to build a fence up against the bluff and that the property between the bluff and where the fence was built belonged to the city and was not fenced in. She testified that Charley France stole some cattle and accused her husband of stealing them.

## OPINION

In 1937 Mr. and Mrs. Andrew France conveyed two small tracts by warranty deeds to H. N. Pollock and to Dr. J. S. Gregg. The descriptions in both of these deeds are by metes and bounds beginning at the northwest corner of the "Elsenrath tract" and running to "bottom of bluff joining Fort Smith Lake property, thence South along bottom of bluff. . ." In October, 1949, Mr. and Mrs. France conveyed by warranty deed to John B. Dahin

et al, a tract of land in this same 40 acre tract described, in part, as follows:

"Starting at the North East corner of the forty for a place of beginning, thence South to bottom of bluff and then following said bottom of bluff line in a- Southwesterly direction 215 yards to hollow branch this line being the dividing line between the A. J. France and the Ft. Smith lake property."

There is no evidence in the record that the city ever had its lands surveyed, or ever marked its boundary lines, prior to the institution of this litigation. It is obvious from the descriptions in the 1937 deeds to Pollock and Dr. Gregg that Andrew and Lula France recognized the "bottom of the bluff" as the division line between the property they retained and the property they sold to the city. Andrew died in 1952 and there is considerable evidence that Charley continued to use the land for livestock pens and corrals from 1952 until this suit was instigated. Mr. Sult and Mr. Luce testified that no one was supposed to keep cattle or livestock on the city land between the bluff and the fence, and that the caretakers attempted to keep cattle out of the area. Charley France testified that the words "west of the bluff" as described in the deed to the city, could be construed to mean anywhere between the vertical rock cliffs shown in some of the photo exhibits and the creek at the foot of the hill. In other words, it is his contention that the "bluff" is not a vertical wall across the 40 acre tract, but in some places is a steep hill rather than a sheer wall; and that the terms "west of the bluff" and "bottom of the bluff" as used in the deeds, are ambiguous terms in defining the land boundary line.

In any event, we conclude that the chancellor's findings are not against the preponderance of the evidence that Charley France and his grantees held and used the property openly, notoriously and adversely to the city for more than the statutory period of seven years. Ark. Stat. Ann. § 37-101 (Repl. 1962); *Montgomery* v. *Wallace*, 216 Ark. 525, 226 S. W. 2d 551.

We find no merit in the city's second point. It appears that the case was fully developed before Chancellor Dunn, prior to his death, as evidenced by his findings of fact and conclusions of law. Chancellor Kimbrough had authority to enter the decree and we find no abuse of his discretion in doing so and in his refusal to reopen the case for a new trial. *Hyder v. Newcomb*, 234 Ark. 486, 352 S. W. 2d 826.

The decree is affirmed.

FOGLEMAN, J., concurs.

HARRIS, C. J., dissents.

JOHN A. FOGLEMAN, Justice, concurring. I would affirm the decree, because I do not feel that appellant has met its burden on appeal.

In cases where location of a boundary line, with overtones of adverse possession, is involved, we have held that the question is determined upon a preponderance of the evidence and that we must affirm a chancellor's decree unless his holding is clearly against the preponderance of the evidence. *Kieffer v. Williams*, 240 Ark. 514, 400 S. W. 2d 485. This is simply an application of the long-standing rule that this court will not, on appellate trial de novo, reverse a chancery court decree making findings of disputed questions of fact on conflicting evidence unless they are clearly against the preponderance of the evidence. *Hunter v. Dixon*, 241 Ark. 725, 410 S. W. 2d 389. It is incumbent upon an appellant to establish that such findings are erroneous. *City of Little Rock v. Sunray DX Oil Company*, 244 Ark. 528, 425 S. W. 2d 722.

In cases where testimony concerning descriptions, lines, boundaries, corners, location of buildings, physical evidence of points, areas, focal points, etc. is indefinite, we defer largely to the chancellor's conclusions regarding matters ambiguous in print. *Hopkins v. Williams*, 215 Ark. 151, 219 S. W. 2d 620. When we cannot be assured that all pertinent evidence considered by the

chancellor is before us, in boundary cases, we must affirm his decree. *Johnson* v. *Smith,* 215 Ark. 247, 219 S. W. 2d 926.

I am simply unable to say, upon the abstracts of the record before us, that the chancellor's holding is erroneous or clearly against the preponderance of the evidence. I am compelled to defer to the chancellor's conclusion under the circumstances. I cannot follow the critical testimony on the points involved, partly because I have no assurance that all pertinent evidence before the chancellor is available to us. In order to follow the testimony with any degree of understanding it would be necessary that each of us have available an abstract or reproduction of many of the exhibits to which the witnesses, the attorneys and the chancellor referred. This is the reason that our Rule 9 (d) requires an abstract of the record of such material parts of the pleadings, proceedings, facts, *documents and other matters* in the record as are necessary to an understanding of all questions presented to this court. See Rule 9, Supreme Court Rules, 3 A, Ark. Stat. Ann. (Supp. 1969). Compliance with that rule specifically requires:

> Whenever a map, plat, photograph, or other exhibit must be examined for a clear understanding of the testimony, the appellant shall reproduce such exhibit by photography or other process and attach such reproduction to the copies of the abstract filed in this court and served upon the opposing counsel, unless this requirement is shown to be impracticable and is waived by the court upon motion.

It was not shown that it was impracticable to reproduce the exhibits in this case, and the requirement was not waived by this court. It seems that reproduction of at least one important exhibit, a plat referred to in oral argument, would have presented no difficulty.

We have affirmed decrees previously upon the basis of my concurrence. In *Smock* v. *Corpier,* 226 Ark. 701, 292 S. W. 2d 260, we said:

In reply to the appellee's criticism of the abstract the appellant insists that it is unnecessary to abstract the testimony in a chancery case, for the reason that this court tries the case *de novo.* The appellant is mistaken in her understanding of our practice. The case is tried *de novo,* it is true, but the trial is upon the evidence as abstracted by the parties and not upon the original record. We have repeatedly required compliance with Rule 9 in equity cases. *Davis* v. *Spann,* 92 Ark. 213, 122 S. W. 495; *Norden* v. *DeVore,* 207 Ark. 1105, 184 S. W. 2d 585; *Reep* v. *Reep,* 219 Ark. 270, 241 S. W. 2d 262.

It is with extreme reluctance that this court considers affirmance of a decree pursuant to Rule 9 (e). It is, and will be increasingly, appropriate that we so act more frequently in view of the case load of this court. My brother Jones has done an excellent and thoroughly painstaking job of analysis of the testimony of the witnesses. I submit that it could not have been done without his reviewing the full transcript of the testimony. I doubt that any other member of the court has the understanding of this testimony to be gleaned from such a tedious and time-consuming perusal. I am aided to some extent by the product of his labors, but I am still unable to exercise any independent judgment as to where the preponderance of the evidence lies on the sharply disputed fact questions involved. I can only concur in the affirmance of the decree.

CARLETON HARRIS, Chief Justice, dissenting. From the standpoint of proof, I consider this case to be very close, but I do not think that appellees sustained their view. Not only that, but in my opinion the equities are entirely with the City of Fort Smith. Admittedly, the city purchased the property in 1935 from the parents of appellee, Charlie France. Now, France, and others to whom the parents had subsequently conveyed part of the land (after conveying it to appellant) are claiming this same land by adverse possession. I think the evidence indicates that the possession of appellees commenced with permission by the city, and I cannot agree

with the majority that appellees have established actual, open, notorious, peaceful, continuous, hostile, and exclusive possession for more than seven years. Of course, there must also be the intent to hold adversely and against the rights of the true owner.

This land is an absolute necessity to the City of Fort Smith in protecting its water supply (Lake Fort Smith) and having purchased the land, it is hardly fair that the city be required to again acquire the same land through eminent domain proceedings.

I respectfully dissent.