SMITH *v.* MAGNET COVE BARIUM CORPORATION.

4-8347                                          206 S. W. 2d 442

Opinion delivered December 8, 1947.

W. H. *Glover* and H. B. *Means,* for appellant.

Joe W. *McCoy* and *Bridges, Bridges, Young & Gregory,* for appellee.

GRIFFIN SMITH, Chief Justice. Town Creek, with its source north of Malvern, runs through part of the City, and eventually, empties into Ouachita River. Magnet Cove Barium Corporation in its milling operations utilizes the creek for disposal purposes. Ore-bearing earth, from which barium is separated, goes through the mill where large quantities of water are used in conjunction with chemicals, in consequence of which a liquid residue passes into the drainway. When dry it becomes whitish gray; and because of the high state of pulverization, this excess—referred to as "tailings"—hardens and forms a coating on lands adjacent the creek, or it is deposited irregularly when during wet weather an overflow of the stream occurs.

J. Millard Smith owns 145 acres, some on either side of the creek, beginning at a point approximately a mile below the mill. The farm was purchased "twenty or thirty years ago" at a cost of $120 per acre. In a complaint filed February 12, 1945, Smith alleged that mud and slush discharged from the Corporation's mill impaired the creek to such an extent that its waters were destroyed for fishing purposes. Cattle, drinking, from the stream, were injured or found the adulteration so offensive as to avoid it. During high water deposits containing minerals and chemicals flooded valuable parts of Smith's lands. When the creek returned to its banks sediment caused permanent impairment, resulting in damages of $2,500. In addition to compensation, the plaintiff asked that the defendant be enjoined from dumping its tailings into the creek.

In response to the Court's direction that the complaint be made more definite and certain, an amendment filed April 27th described the land with particularity and

increased from $2,500 to $9,000 the amount of damages alleged.

August 3d of the same year J. B. Smith and Guy Haltom intervened, each alleging he owned lands "adjacent to Town Creek and to the Ouachita River." They adopted Millard Smith's complaint in so far as applicable to them, emphasizing that prior to pollution the river was a clear, navigable stream, to which game fish and other varieties were indigenous. The waters, it is said, " . . . have been extensively used as a public fishing and outing stream since Arkansas has been inhabited by the white race—much used by the public for bathing, watering stock, and for sport and commercial fishing by those living in the vicinity, and by visitors." The defendant Corporation's conduct in dumping its refuse into Town Creek, said the complaint, damaged these two interveners, who asked that an injunction issue. There was no demand for compensation.

Answering Haltom and J. B. Smith, the Corporation asserted that Hot Spring Circuit Court consolidated complaints filed by them in which they alleged that by reason of the defendant's act in dumping its tailings into Town Creek, use of their lands had been totally destroyed. Haltom recovered judgment for $600, and Smith $100.

The Chancellor rejected injunction pleas of each of the three, holding—in respect of Haltom and J. B. Smith —that their rights were adjudicated in the Circuit Court action, hence *res judicata* barred them. J. Millard Smith was not entitled to this extraordinary remedy, there being adequate facilities at law.

The contention that rights of Haltom and J. B. Smith had been adjudicated is, *prima facie*, correct. There is nothing in the abstract to show that the Circuit Court judgments did not compensate the prevailing plaintiffs in all respects. If full payment were made for total injury, there could be no recurring loss. Since the pleadings are not available we must assume that matters covered by the judgments justified the Chancellor's findings. We also think the Chancellor acted with judicial

discretion in declining to restrain appellee on the showing made by J. Millard Smith.[1]

A great deal of testimony was supplied from which the Chancellor could have found that J. Millard Smith's farm had been extensively damaged. Austin Inglis, surveyor, had prepared a drawing (spoken of by attorneys and witnesses as a map) showing the Smith property, with designation of areas believed to have been damaged by deposits of barium sediment, boundaries marking cultivated and non-tillable lands, and giving other information helpful to the trial Court in arriving at an understanding of the physical layout. This witness "thought he would be safe in saying something like half of the land had been overflowed, 'and has this on it.' " He then added, "You can find evidence, [but] of course they cultivated it."

Specifically the Court understood (as indicated by a question) that Inglis had testified damages extended to 20.4 acres. A question on cross-examination was: "The only land that has been greatly damaged is this piece right here—I am talking about the land they have been farming recently: the only appreciable damage is in the south corner of the northeast southwest?" Answer: "I don't know what it would take to damage a piece of land, because it did have an awful lot of it. I don't know whether it damaged it or whether it didn't." Inglis later testified that during the preceding four years half of the twenty acres affected by sediment had been in cultivation:—"that is just an estimate; it could vary from it a little bit. I made this map."

There were other references to the map. Unfortunately it has not been included in the bill of exceptions; hence the Chancellor had access to it, but we do not. It would be helpful in understanding what other witnesses had in mind—areas to which they pointed while testifying.

Source of Smith's damages—whether from appellee's mill, or contributed to by others—is in substantial

---

[1] *Meriwether Sand & Gravel Co.* v. *State*, 181 Ark. 216, 26 S. W. 2d 57, is cited. In that case regulatory power of the sovereign was invoked. In the instant case the State was not a party.

dispute. Town Creek has its source three or four miles north and east of Malvern. It flows in a southwesterly direction through a part of the City. Ouachita River is three miles southwest of Malvern. The creek has been intersected at a point two miles north of the municipality by a canal cut for use of Acme Brick Company. Through it sand and clay are carried into the creek during high water periods. The industrial community of Perla, two miles north of Malvern, disposes of sewage through two septic tanks. These empty into the creek. Another septic tank appurtenant to Jernigan Addition east of Malvern connects with Town Creek. In addition the Negro settlement east of the City, with out-of-doors toilets, drains into the creek. A stockyard, railroad refueling station, and other sources of contamination add to the burden of pollution.

. Appellants introduced testimony that except during rainy weather the creek was clear before its waters reached appellee's mill, and discolored thereafter. On the other hand there was testimony that the flowage was laden with feculence to such an extent that human consumption of fish would endanger health; nor was it advisable that the waters be used for bathing or swimming.

In arriving at a determination of apportionable responsibility the Chancellor had to consider contributing causes that were not easily divisible by any accepted method of admeasurement. One witness in assigning reasons he would not want some of the land—approximately 25 acres—said it wasn't worth anything "with its possibilities in the future." There was evidence, however, that the Company had changed its methods of operation in respect of the creek, and that in the future the acts complained of would be restricted or eliminated entirely. Some of the witnesses, while conceding that a coloring coat of what appeared to be brownish powder or "talcum," was on some of the land, did not know the extent of injury it would cause or whether its effects could be neutralized by relatively inexpensive treatment.

An example of the difficulty an appellate court has in reviewing records containing testimony by witnesses who

indicated by gesture, or pointed to maps, or who spoke of areas known to those who were listening, is found in the following illustration:

(Referring to a photograph, shown as an exhibit and brought into the bill of exceptions)—"what is that picture?" A. "That is across the creek from where this first picture you gave me was made." Q. "That is back in here?" A. "Oh, yes." Q. "After you cross this creek it is south of where it makes its turn back to the old river?" . . . (Answer to another question): "The barn sits right here." Q. "We were right up the creek showing all the vacant places." A. "I still believe you are farther back here than that. Here is where you come up out of the slough on the road: here is the road that goes out to Cox's corner. Here is your road." Q. "I guess we were right along here." A. "Yes, and the ponds are over here."

In their effort to present a comprehensive review of all that took place in the courtroom, appellants have virtually copied the testimony instead of abstracting it. Much is irrelevant and repetitious.

It was "found" that J. Millard Smith had been damaged to the extent of $750. A preponderance of the evidence must have convinced the judicial mind that in view of all of the facts this sum would compensate the plaintiff for that part of his injury inflicted by the defendant. It does not mean that the actual loss did not exceed this sum; nor can it be supposed that absolute accuracy has been achieved.

The word "preponderance" in its application to evidence has been defined so often that the term itself is aphoristic. The law, or practice, requires that the result of a controverted matter submitted to judicial investigation shall be sustained by a preponderance of the evidence.[2] In the Restatement, Model Code of Practice, the conclusion is that "It is everywhere agreed that 'preponderance of the evidence' means evidence of greater

[2] We are not discussing the test on review of law cases, where the question is whether there was substantial evidence.

convincing force." In *Superior Lloyds of America* v. *Foxworth,* Tex. Civ. App., 178 S. W. 2d, 724-5, it was held not error to charge that "preponderance of the evidence" meant greater weight or degree of the testimony. The term does not mean preponderance in amount, but implies an overbalancing in weight.—*United States* v. *Mancini,* D. C. Pa., 29 F. Supp. 44-5. A somewhat different expression is: " 'Preponderance of the evidence' is a preponderance of all reasonable inferences that might be drawn to prove principal facts sought to be established, sufficiency to outweigh all other contradictory inferences." *Firemen's Fund Indemnity Co.* v. *Perry,* 5 So. 2d 862-3, 149 Fla. 410.

The words "weight," "credibility," "overbalancing," "degree," "force," "tipping of the scales," and others of similar connotation, have been used by opinion writers so long that one would suppose their inclusion in "preponderance of the evidence" gives to the term a fixed, inflexible meaning, applicable alike to all cases where the rule invokes the use. Much must be left to the Judge who considers the evidence. Nature of the testimony, demeanor of the witness if the hearing is oral, opportunity for acquiring the information it is sought to impart, interest in the subject matter or in the parties to be affected, bias based upon political, secular, or novel social beliefs, regard for accepted conventions in dealing with conduct and behavior, environment, a capacity to understand, fidelity to the oath that has been taken,— these and other considerations are, or may be, components of that general result called "preponderance." The number of witnesses is not controlling, and may even be unimportant. It is possible for cumulus error to overshadow intrinsic truth, and the statement of a single witness may be entitled to more consideration than assertions of a dozen whose source of knowledge or capacity for appraising values impairs the probative force of testimony.

In the instant case many of the witnesses were dealing objectively with what to them appeared to be deposits of sediment presumptively injurious to the soil; and no

doubt they were. But the period of impairment—whether for a single season, two years, or for a greater time—was largely speculative. There was no exact nor even relatively accurate standard by which to gauge results. This, of course, was not imperative to a decision. It did, however, place upon the Court a responsibility for exercising that sometimes difficult duty of determining what testimony preponderated. This had to be done in circumstances where intangible elements were present.

To change the judgment by increasing it to a particular sum would be a guess. The appellant who contends $750 is insufficient fixed $9,000 as an appropriate figure. There is no showing that between the time he thought $2,500 was enough and the time his demand was increased to $9,000 (an interval of two and a half months) additional damages had accrued. This discloses an attitude of uncertainty evidenced by the plaintiff in the ratio of five to eighteen.

For the reasons that have been expressed we are unable to say the Chancellor erred, and the decree must be affirmed. It is so ordered.