GARNER *v.* RICHTER.

4-8481

209 S. W. 2d 442

Opinion delivered March 22, 1948.

· *Carmack Sullivan,* for appellant.

*Sidney Kelley,* for appellee.

GRIFFIN SMITH, Chief Justice. An original indebtedness of $1,500 was alleged. Five notes, each for $300, were executed by Edward and Rozelle Richter when they purchased land from A. F. Garner. By a separate transaction—not involving novation — Will Crooms bought from the Richters and orally assumed payment of the mortgage-secured debt. Default in payment of any note authorized Garner to declare all of them due. This he did when note No. 1 was not paid at maturity January 10, 1947.[1]

When Garner sought judgment for the principal debt and interest, with a decree of foreclosure, Crooms entered a general denial. The Richters admitted execution of three duplicate notes and prayed that they be discharged from liability on the originals.

From a trial Court finding that Crooms had paid the first note Garner has appealed. The Richters have appealed from the Court's refusal to relieve them from liability on the originals of notes Nos. 4 and 5.

[1] Notes 1, 4, and 5 were lost, but duplicates were given.

The Court based its judgment for Crooms on his testimony and upon evidence given by Bill Wells and Sam Wright, balanced against contentions of Garner and the Richters.

Garner testified that about January 15th he went to Crooms' place of business, and while talking generally Crooms asked if the first note was due. When informed that it was, Crooms directed Garner to bring it to him, adding that he would "take care of all [of the $1,500 indebtedness] within a week or two". Garner returned on the 17th. When he told Crooms he had the note the latter replied, "Come in and I will pay you". Crooms was informed that the amount, with interest on the full debt, was $390; whereupon Crooms started to make out a check, while Garner wrote on the back of the note an indorsement to the effect that it had been paid by check on the Hardy Exchange Bank for "Three Hundred Ninety Dollars, ($390), Three Hundred Dollars ($300) Principal, Ninety Dollars ($90) Interest on Principal".

According to Garner's testimony he handed the note to Crooms, expecting to receive the check; but at that time Wells entered and Crooms turned to him and said, "Ain't that the way to do them: get the note, tear up the check, and let them go to hell?"

Garner insisted he spent half an hour endeavoring to get another check, but without avail. After leaving and remaining away two or three hours, he returned and again sought payment, but with no better luck.

Edward Richter testified that Crooms went to his home about the first of January and told Mrs. Richter he had paid the first note. However, at a later period this witness talked personally with Crooms, who claimed to have the note, but did not say he had paid it. Richter also testified that on another occasion he and Mrs. Richter paid Crooms $500 in discharge of a note Mrs. Richter had given as part of the purchase price of the Brewington farm; that Crooms pledged the note to a bank after it had been paid, and that the maker was obliged to employ an attorney in order to recover the note.

146

Crooms testified that Garner brought the $300 note to him, then added, ''I paid him in cash and have the note in my pocket, and I have witnesses that know that fact''. He introduced the note. Spoliation is obvious. Garner thinks the physical facts are sufficient to justify this Court in reversing the finding that payment was made in the manner claimed by Crooms.

The indorsement is shown in the reproduction below.

The abbreviation ''Pd. Jan. 17, 1946, by'' is written with lavender ink with a fountain pen. ''Cash $390. Three hundred ninety'' is in green ink and appears to have been written with a stub pen. The remainder is in lavender ink, in the same chirography as ''Pd. Jan. 17, 1947'', although there is a smear of green ink over the figures ''$1200''. Writing surface of the paper upon which ''Cash $390. Three hundred ninety'' was written

shows considerable fiber disturbance, such as would·be caused by mechanical abrasion. Similar surface mutilations appear elsewhere. ''Nib'' marks, so called, protrude predominately in areas indicating that writing was done with a stub pen after the paper had been abraised. These physical facts are conclusive of the contention that alterations, authorized or unauthorized, were made.

Explanations by Crooms are far from satisfactory. They include the assertion that two weeks before trial he and certain companions were on Spring River. Their boat sank, ''. . . and it made every paper in my pocket wet, [so] the writing or the ink 'ran' as you see them''. When asked if all of the writing was in ink having the same color, Crooms replied, ''I don't know: it looks like it has faded''. And again, ''All I know is that I paid [Garner] the cash. He wrote on the back [of the note] and gave it to me. . . . Nothing has been changed if the water didn't change it''.

Later the witness, in response to further questioning about the ink, testified he wasn't certain the writing was in one color, then added: ''I believe I noticed when he started that he wrote part of it with one pen, and then changed. . . . I remember that I said, 'Garner, you marked [the date] 46'. Then I handed him my pen and he changed it to 47''.

There was other testimony by this witness relating to the same transaction, but it amounts to a denial of any knowledge of changes other than substitution of pens, and in that explanation there are discrepancies.

Crooms insisted that he paid Garner ''In $100 bills and some twenties, . . . [and] all entries and writing on the note were made by Garner in my office. It is common for me to have a lot of cash''.

Wells testified that he lived at Hardy, and when the transaction in question occurred was a school bus driver. He was in Crooms' garage in January, but ''didn't see very much'', because engaged with Sam Wright in repairing a carburetor. Garner was overheard·to tell

Crooms he had "brought those papers down". Following a short conversation, substance of which the witness did not understand, Garner asked Crooms if he was "ready", and the latter gave an affirmative response,— "And then Garner shelled out the papers and [Crooms] paid the money. I saw some hundred dollar bills. [Crooms] gave the money to Garner and [received] the papers. Garner thanked him and said, 'Willey, I am one of the busiest men in town'. He remained about twenty minutes, and left. I don't know how much money [Crooms] paid Garner".

Wright testified substantially as did Wells. He was certain money passed, but didn't know how much. The only thing he heard was when Garner went to leave. At that time "he took the money out of his pocket and rolled it all up and put it [back] in his pocket, and said, 'I am the busiest business-man in Hardy' ".

Garner, upon being recalled, testified there was not a word of truth in what Crooms, Wells, or Wright said about payment having been made with money. There was the further assertion that neither Wells nor Wright was in the office, but were some distance away working on a carburetor. He then added: "I did not write the word "cash" on the back of the note. I wrote "check" in there, and I wrote the whole thing in purple ink.[2]

This case presents an impressive example of difficulties confronting a judge in determining where a preponderance of the evidence rests. *Smith* v. *Magnet Cove Barium Corporation*, 212 Ark. 491, 206 S. W. 2d 442, The Chancellor subjected Crooms to a judicial questioning. He appears to have entertained doubt that Crooms made frank disclosures; anl yet, after considering all of the seeming contradictions or evasions, and taking into account the statements made by presumptively disinterested witnesses, the trial Court resolved doubts in favor of Crooms.

The members of this Court are not satisfied that an injustice is not being done Garner. On the other hand

[2] Garner describes the ink color as "purple". It has been referred to in this opinion as lavender.

the Chancellor, in questioning the witnesses, had the advantage of observing conduct, demeanor, and expressions. In these circumstances we reluctantly affirm.

The court did not err in refusing to hold the Richters harmless absolutely on the original notes that are claimed to have been lost. The record discloses discussions amounting to admissions that copies were executed as a result of A. F. Garner's representations to the Richters that Notes 1, 4, and 5 had been lost, hence, as between the parties to this litigation, an estoppel by record would arise. However, the lost instruments would be valid in the hands of an innocent purchaser who bought for value before maturity without notice.