**Joyce Carolyn SMITH, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. No. 79–5092.

United States District Court, W.D. Arkansas, Fayetteville Division.

Oct. 4, 1982.

---

Erwin L. Davis, Fayetteville, Ark., for plaintiff.

Karen M. Shichman, Trial Atty., Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

*Introduction*

Plaintiff, Joyce Carolyn Smith, brought this action under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.*, seeking damages allegedly resulting from Mrs. Smith's receipt of a swine flu inoculation during the immunization program undertaken by the federal government in the National Swine Flu Immunization Program of 1976, 42 U.S.C. § 247b(j)–(*l*), Pub.L. No. 94–380, 90 Stat. 1113 (1976) (amended 1978) [hereinafter Swine Flu Act]. Specifically, Mrs. Smith contends that she contracted Guillain-Barre Syndrome (GBS) as a result of the vaccine.

The government contends that plaintiff, Joyce Carolyn Smith, did not develop GBS and that there is no causal connection between the vaccine and plaintiff's condition.

Pursuant to 28 U.S.C. § 1407, this case was transferred by the Judicial Panel on Multi-District Litigation to the United States District Court for the District of Columbia for Consolidated and Coordinated Pre-trial Proceedings. Subsequent to a Final Pre-trial Order issued by the transferee court, *In Re Swine Flu Immunization Products Liability Litigation,* 89 F.R.D. 695, (D.D.C.), this case was remanded to this Court for trial and final disposition.

Prior to trial both parties filed motions for bifurcated trial, which originally were denied, but were later granted in part. The final pre-trial order stated in part that if the Court determines that the plaintiff's illness is Guillain-Barre Syndrome, no theory of liability on the part of the United States need be proven, and the only issue as to liability would be causation.

Having considered the evidence, briefs, and arguments of the parties, the Court makes the following findings of fact:

1. This action is brought under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.,* by plaintiff, Joyce Carolyn Smith, for the acts or omissions of agents or employees of the United States under the National Swine Flu Immunization Program of 1976, 42 U.S.C. § 247b(j)–(*l*), and for the acts or omissions of "program participants" as defined in the Act.

2. The Swine Flu Immunization Program of 1976 was a governmentally-undertaken attempt to inoculate the entire population, prompted by the discovery at Fort Dix, New Jersey, of individuals having influenza of the "swine" type and the resulting concern that an epidemic would occur. The Act directed the establishment of a national swine flu immunization program and in pertinent part provided the following:

> The Act created a cause of action against the United States for any personal injury

or wrongful death sustained as a result of the swine flu inoculation resulting from the act or omission of the program participant upon any theory of liability that would govern in an action against such program participant including negligence, strict liability in tort, and breach of warranty. 42 U.S.C. § 247b(k)(3) (amended 1978).

The Swine Flu Act made the above cause of action the exclusive remedy and abolished any causes of action against the vaccine manufacturer by individual claimants. 42 U.S.C. § 247b(k)(3) (amended 1978).

It made the procedures of the Federal Tort Claims Act applicable to suits brought pursuant to the Swine Flu Act, 42 U.S.C. § 247b(k)(4) (amended 1978). The Act directed the development and implementation of a written informed consent form and procedures for assuring that the risks and benefits from the swine flu vaccine are fully explained. 42 U.S.C. § 247b(j)(1) (amended 1978).

Vaccinations began on October 16, 1976, and the program was suspended on December 16, 1976, following reports of a number of participants developing GBS within a ten-week period after inoculation.

3. Plaintiff was born on July 18, 1927, and at the time she received a swine flu immunization she was 49 years of age.

4. At all times pertinent to this action, plaintiff resided in Springdale, Arkansas.

5. Plaintiff has been a regular patient at the Sisco Clinic in Springdale, Arkansas, since 1948. Plaintiff's medical history includes treatment for low energy in 1948, tiredness in 1965, headaches on seven recorded occasions, and rash from medication.

6. Between 1964 and 1969, plaintiff was hospitalized at the Springdale Memorial Hospital three times, with complaints of headache associated with menstruation, loss of appetite, weakness, dizziness, aching, nausea, fever, and soreness of the abdomen.

7. On November 12, 1976, plaintiff underwent a physical examination at the Fayetteville Diagnostic Clinic, including blood tests, urinalysis, x-rays, EKG and pap smear, complaining of tenseness, depression and migraine headache.

8. Plaintiff returned to the Fayetteville Diagnostic Clinic on November 19, 1976, to discuss the test results with Dr. Higginbotham. While at the clinic, plaintiff observed printed solicitations for free swine flu immunizations.

9. That same day, November 19, 1976, plaintiff received a bivalent swine flu immunization at the Fayetteville Diagnostic Clinic.

10. On December 1, 1976, Colleen Watson, the plaintiff's sister, visited with plaintiff at her home. Plaintiff was in bed complaining of general weakness.

11. On December 4, 1976, Ms. Watson again visited the plaintiff. Plaintiff was again in bed with complaints of weakness, localized numbness and aching in her legs, and generalized uncoordination. Plaintiff had fallen attempting to traverse the distance to the bathroom and was unable to grasp nearby objects at her bedside.

12. On December 5, 1976, plaintiff was hospitalized at the Springdale Memorial Hospital, and was diagnosed as having an urinary tract infection (UTI), causative agent e. coli, with migraine headaches. The final diagnosis was acute pyelonephritis (inflammation of the kidney) and cystitis (inflammation of the bladder). Keflex was administered for the infection.

13. On December 8, 1976, an EEG was performed, as well as echoencephalogram, brain scan, and flow study. No abnormalities were apparent. Plaintiff was discharged on December 11, 1976.

14. Plaintiff was re-hospitalized on December 12, 1976, complaining of aching and severe headaches, and was noted to have moderate stiffness of the neck and tenderness of the left lower quadrant of the abdomen. A UTI was again identified and treated with Keflex.

15. During the December 12, 1976—December 17, 1976, hospitalization, no tests for neurogenic bladder were available. No cause for the recurring bladder infection

was identified. Plaintiff continued to have chills and shaking. Reflexes were within normal limits.

16. A cystoscopy was performed by Dr. Brooks. Plaintiff was released on December 17, 1976.

17. During the next week and a half plaintiff suffered weakness and uncoordination, remaining in bed. Plaintiff was unable to perform any of her usual duties or activities and required ambulatory assistance.

18. On December 27, 1976, plaintiff was returned to the hospital, complaining of "different" headaches, generalized aching, frequency of urination, and soreness. A UTI was identified and antibiotics were administered. Plaintiff complained of "tingly" skin until her discharge on January 2, 1977.

19. For the next three weeks plaintiff was weak, had no coordination of her hands, and could barely walk, suffering falls on several occasions. Plaintiff's hands were shaky and plaintiff remained in bed.

20. Plaintiff's condition varied little until January 25, 1977. On that date plaintiff awoke with a headache and went to the Sisco Clinic for treatment. After plaintiff returned home, she slept for several hours. Upon awakening she was unable to move. An ambulance was called and plaintiff was transported to the Springdale Memorial Hospital. Complaints upon admission included headache, pain, and lack of control over her limbs.

21. Beginning the day of admission, plaintiff experienced a slight fever and bilateral motor weakness, originally more pronounced on the right side of her body, but later resolving into relative bilateral symmetry.

22. Plaintiff also suffered breathing impairment. Deep tendon reflexes (DTR) were low-normal with a positive Babinski sign (patellar reflex) and Snout reflex.

23. While in the Springdale Hospital, a spinal tap was performed, evidencing normal amounts of cerebrospinal fluid (CSF) protein. An EEG was performed, showing significant differences from the December, 1976, EEG.

24. During this hospitalization in Springdale, Dr. Charles Sisco considered the possible diagnosis of GBS, but, believing that absolute symmetrical weakness and elevated SFP were required symptoms, diagnosed merely quadraparesis, profound motor weakness in all quadrants.

25. After two days, plaintiff was transferred to Washington Regional Medical Center in Fayetteville, Arkansas.

26. On January 28, 1977, Dr. Jorge Johnson noted spontaneous movement of plaintiff's left lower extremity and some improvement in leg strength.

27. On February 5, 1977, plaintiff was allowed to visit her home on a pass. She returned shortly after developing generalized itching. Medications were discontinued. The specific cause of the itching was not identified.

28. Dr. Johnson noted the possible diagnosis of encephalopathy, but could not identify any specific neurological disorder other than the pathological term, "quadriparesis."

29. On February 11, 1977, plaintiff was returned to the Springdale Hospital where she improved slightly until February 23, 1977, at which time she was discharged with some residual ambulatory difficulty and weakness and unconfirmed episodic incontinence of bowel. Final diagnosis was recurrent urinary tract infection, possible encephalopathy with hemiparesis, etiology undetermined.

30. In June, 1977, after gradual improvement, plaintiff again suffered an acute onset of loss of use and control of her stomach muscles, lack of endurance, uncoordination of hands and arms and generalized heaviness of the lower extremities.

31. Plaintiff was placed on additional exercises, including walking and electric bicycle exercise unit.

32. Plaintiff was hospitalized from August 16, 1977, through August 25, 1977, again for UTI, complaining of chills, fever, aching, nausea, and pain upon urination.

33. Dr. Charles Sisco noted on August 18, 1977, that plaintiff's problems related to her central nervous system status which was evidenced by her confusion and disorientation.

34. Plaintiff was diagnosed as having acute pyelonephritis, acute tubular necrosis, hyponatremia (sodium depletion), and frequent premature ventricular beats.

35. On April 17, 1978, plaintiff was examined by Dr. Higginbotham, who noted that plaintiff had had Guillain-Barre Syndrome over a year earlier, with present residual right-sided paralysis which was not improving greatly. Plaintiff's hands still shook and grip was poor.

36. In May, 1978, plaintiff fell and suffered broken ribs and pneumothorax (accumulation of gas in the pleural cavity) evidencing her continued weakness.

37. Subsequent to the increased incidence of Guillain-Barre Syndrome associated with the swine flu vaccine in 1976, the National Institute of Neurological and Communicative Disorders and Stroke (NINCDS) compiled diagnostic criterion for GBS.

38. The NINCDS criterion were not formulated in an attempt to narrow the definition of GBS, nor to impose a set of "black letter" absolutely required diagnostic boundaries for the rare disorder, but to publicize several diagnostic "tools" or guides to the recognition of GBS.

39. GBS is an ascending polyradiculoneuropathy (a nerve disorder affecting many nerves, affecting the proximate or large muscles) of a demyelinating type in which the sheath or myelin of the nerve degenerates.

40. The NINCDS criteria absolutely require for diagnosis of GBS both progressive motor weakness of more than one limb and distal deep tendon areflexia (loss of tendon jerk). Factors strongly supportive of GBS include (1) rapidity of onset (acute or subacute); (2) relative symmetry of symptoms; (3) cranial nerve involvement; and (4) elevation of SFP (spinal fluid protein).

41. Dr. Charles Poser, an eminent investigator and writer of GBS literature, has formulated his own criteria for the diagnosis of GBS. Dr. Poser's criteria do not absolutely require areflexia of the distal deep tendons. Nor is elevation of SFP required. Absolute symmetry of symptoms is not required, so long as bilateral. There can be some central nervous system involvement.

42. Many authoritative definitions of GBS abound with various symptomological factors to consider. Among these are (1) acute or subacute onset of paralysis; (2) lower motor neuron involvement, symmetrical and ascending; (3) mild sensory involvement; (4) lack of cellular response in the SFP; (5) lack of preceding or accompanying illness known or thought to cause polymyeloradiculoneuropathy (such as diabetes myelitis); and (6) lack of other diagnostic indications.

43. The Centers for Disease Control conducted an epidemiological investigation under the auspices of Drs. Henry Retaillian and Michael Hattwick which indicate that GBS and certain types of anaphylaxis are the only serious illnesses associated with the swine flu vaccine.

44. Polyenchalomyeloradiculoneuropathy is a pathological definition of GBS. Over 100 antecedent events have been associated with GBS and the encephalitides, although the precise mechanism is currently unknown. No single biochemical test can be performed to determine the presence or absence of GBS in the plaintiff's case.

45. It is impossible to medically distinguish between a viral encephalomyelitis and one caused by a vaccine. The most common antecedent events associated with GBS are infectious illnesses one to four weeks prior to the onset of symptoms and recent vaccination.

46. In a significant percentage of GBS cases, there is no identifiable precedent event which is thought to be possibly associated with GBS.

47. The exact date of onset of plaintiff's neurological symptoms is unknown, but was

between December 1, 1976, and January 25, 1977.

48. The primary concentration of vaccine-related GBS occurs within one to six weeks following vaccination, although the risk of vaccine-related GBS does not disappear, for practical purposes, until the end of the twelfth week.

49. Involvement of the peripheral nervous system is associated with a decrease of reflexes (hyporeflexia) or total reflexia. Involvement of the central nervous system is often associated with an increase of reflex, or hyperreflexia. Where both the central and peripheral nervous systems are involved, reflexes may appear to be within the normal range, although the patient may in fact suffer from polyencephalomyeloradiculoneuropathy.

50. There is no credible evidence in the record that plaintiff suffered from multiple sclerosis (MS). Nor is there evidence from which the Court can find that plaintiff's neurological difficulties resulted from an adverse allergic reaction to Keflex or other medication.

51. Other causative theories advanced by the government include nervousness, stroke, and a mild degree of cortical atrophy. The Court finds no great degree of support for any of these theories which would rise beyond the level of speculative possibility.

52. The Court is unable to find by a preponderance of the evidence that plaintiff was in fact afflicted with GBS following her vaccination. The Court is similarly unable to conclude that plaintiff did *not* suffer from GBS following her vaccination. The weight of the evidence on this point is equally divided between the plaintiff and the government.

53. The Court is unable to find by a preponderance of the evidence that plaintiff's malady was caused or precipitated by the swine flu vaccine. The Court is likewise unable to find by a preponderance of the evidence that plaintiff's affliction was *not* caused by the vaccine. The Court considers the evidence on this point, too, to be equally balanced between the plaintiff and the government. No inference for or against the presence of GBS or causation of plaintiff's polyencephalomyeloradiculoneuropathy can logically be drawn from the materials submitted.

*Discussion*

The Court will not reiterate the factual setting presented, except insofar as necessary to explain the Court's finding that plaintiff has failed to carry her burden of proof.

Guillain-Barre Syndrome is a rare neurological disorder which normally occurs in approximately one per one hundred thousand persons per year.

The most central issue of this litigation focuses upon the signs and symptoms which must be found in order to establish a diagnosis of Guillain-Barre Syndrome. As addressed at trial, Guillain-Barre Syndrome is a disorder which by definition affects the peripheral nervous system. The testimony on this point, both by witnesses for the United States and the witnesses called on behalf of the plaintiff are in agreement on this point.

The governmental surveillance program revealed that vaccinated persons had a significantly elevated risk of developing GBS. The studies revealed that by the end of the twelfth week following vaccination any increased risk of GBS disappears.

Subsequent to the increased incidence of GBS associated with the swine flu vaccine in 1976, the National Institute of Neurological and Communicative Disorders and Stroke (NINCDS) reviewed the available medical literature and compiled diagnostic criterion for GBS to help physicians recognize the diagnostic boundaries of this relatively rare and highly publicized disorder.

The two features which were necessary to make a GBS diagnosis are progressive motor weakness and areflexia. Although universal, or complete areflexia was noted to be the rule in GBS patients, the Committee recognized that distal areflexia would suffice if other features were consistent. MDL Document No. 85.

The plaintiff's reflexes in her extremities were consistently reported to be within normal limits by Dr. F. Sisco, Dr. C. Sisco and Dr. Johnson.

Plaintiff's principal expert was Dr. Charles Poser, a board certified neurologist with impressive credentials, author of numerous articles and texts on GBS and other demyelinating diseases.

He testified that, in his opinion, plaintiff suffered from GBS as a direct result of her swine flu vaccination. Dr. Poser ruled out multiple sclerosis and drug reaction as the diagnosis.

Dr. Poser explained plaintiff's atypicality of symptoms with reference to the criterion of areflexia. According to Dr. Poser, involvement of the central nervous system can cause a hyperreflexia of the distal deep tendons. Thus, although peripheral nervous system involvement generally causes hyporeflexia, where both nervous systems are involved, reflexes may appear to be within normal limits.

Dr. Poser testified that plaintiff suffered from an ascending polymyeloencephaloradiculoneuropathy, which he termed a pathological definition of GBS in plaintiff's case.

Dr. Dennis Lucy, the Chairman of the Department of Neurology at the University of Arkansas School of Medicine in Little Rock, Arkansas, testified at the trial of this action, and rendered his opinion of the diagnostic requirements necessary to indicate the presence of GBS. Dr. Lucy did not share Dr. Poser's opinion that plaintiff had GBS.

Concerning the question of loss of reflexes, Dr. Lucy testified that a finding of loss of deep tendon reflexes (DTR's), at least in the distal muscles was essential to a diagnosis of GBS. Dr. Lucy recognized the plaintiff's normal reflexes as a basis upon which to rule out the diagnosis of GBS.

Dr. Lucy was of the opinion that the NINCDS Criteria were authoritative. He testified that he became aware of the criteria enunciated by the NINCDS Ad Hoc Committee in 1978, but that they did not alter his own diagnostic criteria for diagnosing GBS. The NINCDS Criteria corroborated the diagnostic criteria he had routinely used in his practice for a number of years.

Dr. Lucy stated that central nervous system involvement with GBS is uncommon and that in his twenty years of experience in treating patients with GBS, he has treated only one patient with mild central nervous system symptoms. In his opinion, well under one per cent (1%) of GBS patients would evidence central nervous system signs and symptoms. The diagnosis of GBS, as testified, should not be considered where central nervous system involvement is present unless the rest of the picture of GBS is well documented.

Plaintiff experienced symptoms predominately indicative of central nervous system involvement. As testified by Drs. Johnson, C. Sisco, Poser, Tyler and Lucy, the presence of a Babinski sign is a clear indication of a central nervous involvement. The abnormal EEG performed during plaintiff's hospitalization of January 25, 1977, demonstrating findings consistent with a cerebral head injury, is a further indication of an ongoing central nervous system process. Dr. Lucy testified that in the presence of a peripheral nervous system disorder, EEG results would not be altered, as they were here, from the EEG performed in December of 1976. Dr. C. Sisco was of the opinion that plaintiff was exhibiting predominant central nervous system signs and symptoms.

Testimony was elicited at trial concerning the rise of cerebral spinal fluid protein as being supportive of a GBS diagnosis. As testified by Dr. Lucy, a rise in the CSF protein upon spinal tap occurs in the "vast majority of GBS patients." The plaintiff's CSF protein was well within normal limits in spite of the fact that spinal taps were performed on three separate occasions during the course of her illness. This laboratory result is not indicative of the presence of GBS.

Plaintiff elicited testimony that plaintiff suffered from flaccidity of the bladder as a direct result of GBS and that this contributed to plaintiff's frequent UTIs.

There is no objective test which can be performed in order to determine the presence of flaccid muscle, as there is with the measurement of deep tendon reflexes. The presence of flaccid muscle is determined by physically feeling the muscle. For this reason, it is difficult to evaluate. When questioned at trial whether a finding of flaccid muscle was a sufficient finding to make a diagnosis of peripheral nerve involvement, Dr. Lucy said no. He further testified that he is unaware of any physician who would include flaccidity as a diagnostic criteria for GBS.

Dr. Lucy examined the plaintiff in September of 1981. At that time plaintiff exhibited "give away weakness" which, the government contends, implies psychogenic rather than organic dysfunction. This was exhibited, the government argues, by plaintiff's resistance to a point, then dropping of arm rather than demonstrating gradual inability to hold her arm up. In addition, plaintiff demonstrated relatively asymmetrical DTR's, which is unusual for GBS. Dr. Lucy testified that the plaintiff's disorder may have been progressing. This is not a feature found in most GBS patients. Although Dr. Lucy testified that GBS could be ruled out as a diagnosis, multiple sclerosis could not be in the plaintiff's case.

Dr. Tyler, a neurologist affiliated with Harvard Medical School, was called as a witness by the United States by means of videotape deposition. Dr. Tyler is presently the Chief of the Neurology Section at Brigham and Womens Hospital in Boston, Massachusetts.

Dr. Tyler defined GBS as an acute or subacute illness of unknown etiology which by definition affects the peripheral nerves and nerve roots. The primary complaint of GBS patients in his opinion was increasing weakness which often develops into some degree of paresis and is almost always symmetrical. Dr. Tyler viewed his definition as being synonymous with the criteria established by Barry Arnason, one of the NINCDS authors.

Dr. Tyler testified that, in his opinion, the onset of the plaintiff's neurologic symptoms was January 25, 1977. Dr. Lucy shared this opinion. Dr. Tyler noted the plaintiff's normal deep tendon reflexes and asymmetry of weakness as factors which, in effect, served to rule out a GBS diagnosis. In fact, based upon his reading of the medical record there was no question that the plaintiff's condition was significantly asymmetrical in nature.

Significant asymmetry in Dr. Tyler's opinion would make a diagnosis of GBS unlikely, and cause one to look for diagnostic alternatives. In his opinion, Mrs. Smith had no evidence of peripheral nerve or root disease. Based upon Dr. Tyler's review of the plaintiff's medical records, he was unable to find anything supportive of a GBS diagnosis and no evidence of peripheral nerve involvement.

In Dr. Tyler's opinion, Mrs. Smith sustained an asymmetrical central nervous system disorder in January, 1977. One suggested possibility for her condition is that she had an allergic reaction which incited a central nervous system dysfunction. Keflex was suggested as a possibly precipitating factor. Dr. Tyler entertained this as a possible etiology because he had experienced a similar situation in one of his own patients. He stated that a relationship between the taking of Keflex and her neurologic condition was a distinct possibility.

Dr. Tyler also testified concerning the etiology, or cause of GBS. Although theories exist, the etiology of GBS is still unknown. In light of this, one must look to data or studies of epidemiology to establish a link if possible with an antecedent event. As testified, among the antecedent events commonly seen prior to the onset of GBS are infection, surgical procedures and viruses. In fact, Dr. Tyler noted that as many as fifty per cent (50%) of GBS patients report surgery as an antecedent event.

The greater the length of time between a particular event and the onset of GBS, the more unlikely it is that the disorder was in any way related to the antecedent event. In Dr. Tyler's opinion, at a period of more than five weeks from the antecedent event, one begins to deal in improbabilities in at-

tempting to create a causal relationship. Based upon this testimony, the tenth week following an antecedent event falls well within the realm of improbabilities. In fact, given the fact that testimony has been elicited that there is no way to determine with any degree of medical certainty what the particular "cause" of GBS is in a particular patient, a neurologic disorder occurring in the tenth week following immunization, with intervening antecedent events such as bacterial infection, surgical procedures, chills and fever, the relationship between immunization and disorder becomes tenuous at best.

Although there is certainly no dearth of reported GBS litigation, because the state of the art is not sufficient for authorities to set forth "black letter" definitions and diagnostic indications, and because each instance of its occurrence is so individualized and particularized, the Court feels that lengthy review of the numerous decisions would shed little light on the issues at hand.

■ The issues to be decided by the Court are purely factual in nature. While this Court does not pretend to possess any medical expertise in this area, certain factors which the Court finds significant indicate that plaintiff has not carried her burden of proof in the instant action.

Because of plaintiff's long medical history of weakness, headaches, dizziness and fatigue, it is unclear exactly when plaintiff's neurological symptoms first appeared, although this would have occurred sometime between the third and tenth weeks after vaccination. According to the Schonberger article, *Guillain-Barre Following Vaccination in the National Influenza Immunization Program, United States, 1976–77,* the chance that any GBS cases would have been caused by the vaccine during this period ranges from slightly higher than 90% to less than 50%, if indeed plaintiff had GBS at all.

The evidence adduced at trial shows that although the increased risk of GBS does not disappear until the eleventh or twelfth week, after the eighth week it becomes quite speculative whether the vaccine caused the onset of GBS.

Since the Court is unable to pinpoint the date of onset of plaintiff's neurological symptoms, the Court is likewise unable to determine whether any such symptoms were caused by the vaccine, with any reasonable degree of medical certainty.

The Court recognizes that the burden the plaintiff must carry in order to be entitled to compensation is not to show causation with absolute medical certainty, but only to show it by a preponderance of the evidence or with reasonable medical certainty. Nor need the experts all be convinced by a reasonable medical certainty. But the Court must be.

■ After careful consideration of all of the evidence, the Court is not persuaded by a preponderance of the evidence that plaintiff's malady, whatever it was, was proximately caused by her November 19, 1976, swine flu vaccine.

First: The Court rejects, as speculative, Dr. Poser's theory that plaintiff's deep tendon reflexes were within normal limits because of both central and peripheral nervous system involvement "cancelling each other out." Although the Court is convinced that this is theoretically possible, the Court is equally unconvinced that it happened in this case. Until Dr. Poser's theory is tested by others and more thoroughly confirmed, the Court is reluctant to accept it.

Second: Even if plaintiff, in fact, had GBS, over 100 antecedent events have been associated with GBS. Among the most common are infectious illnesses one to four weeks prior to the onset of symptoms. Plaintiff was diagnosed on December 5, 1976, as having a recurrent urinary tract infection, causative agent *e. coli,* pyelonephritis and cystitis. Plaintiff also experienced some allergic reactions to Keflex, the antibiotic administered to her for these infections. It is generally accepted that GBS is an auto-immune disease in which the body's immune system is designed to respond to antigens introduced into the body. This response takes the form of antibodies

which attack the foreign material. In the case of an auto-immune disease, the stimulated antibodies become misdirected and attack the peripheral nervous system, either instead of or in addition to the foreign substance. To say that the inoculation was the precipitating proximate cause of plaintiff's affliction is pure conjecture. Since the Court is unable to sufficiently narrow the time-frame in which plaintiff developed her symptoms, the temporal relationship to the vaccination does not create an inference that her maladies were caused thereby.

Third: Nor is it clear, to any reasonable degree of medical certainty that plaintiff had GBS, or any other named neurological disorder. To say that plaintiff suffered from GBS would require many assumptions without supporting evidence. The Court would have to assume that plaintiff's medical history of fatigue, dizziness, weakness and headaches are wholly unrelated to her present symptoms, which include motor weakness, dizziness and headaches. The Court would have to assume that plaintiff's recurrent infections had nothing to do with her current problems. The Court would have to assume that plaintiff suffered from a neurogenic bladder. The Court would have to assume that Dr. Poser's theory is correct and that plaintiff had simultaneous central and peripheral nervous system involvement with simultaneous hyperreflexia and hyporeflexia. The Court would have to ignore the lack of symmetrical weakness and the normal spinal fluid protein levels. The Court would have to disregard the NINCDS criteria which require distal deep tendon areflexia.

Plaintiff urges that there are no absolutely required symptoms associated with GBS other than generalized weakness. Although this makes it more difficult to rule out GBS in any particular case, it also makes it extremely difficult to diagnose GBS as present in any particular case. Plaintiff lacked several classic symptoms and experienced many uncharacteristic symptoms.

Did the plaintiff contract GBS? The Court, quite frankly, does not know. Did the inoculation bring about the onset of plaintiff's symptoms? Here again, the Court does not know.

It appears that the experts presented not only cannot agree as to whether plaintiff had GBS, but further, cannot agree as to what GBS is. The only concept to which all of the experts adhere is that there is no agreement among experts. Even Dr. Poser, plaintiff's principal expert, admits that his views have not yet been generally accepted and he holds only his own writings in esteem. In this state of affairs, how then may the Court say, with any degree of certainty, that plaintiff has met her burden of proof? The answer is that we cannot.

The burden of proof is upon the plaintiff to establish by a preponderance of the evidence that plaintiff suffered from GBS or some other affliction which was proximately caused by the inoculation.

■ "Preponderance of the evidence" means the greater weight of evidence. It is the evidence which, when weighed with that opposed to it, has more convincing force and is more probably true and accurate. If, upon any issue in the case, the evidence appears to be equally balanced, or if it cannot be said upon which side it weighs heavier, then plaintiff has not met his or her burden of proof. AMI 202. *Hays v. Williams,* 115 Ark. 406, 171 S.W. 882 (1914); *Smith v. Magnet Cove Barium Corp.,* 212 Ark. 491, 206 S.W.2d 442 (1947); cf. *Words and Phrases,* Vol. 33, pp. 383–605 (West Publishing Co.).

Because of the confusing, conflicting and theoretical nature of the proof submitted at trial, the Court concludes that the evidence is equally balanced as to whether plaintiff suffered from GBS, or, at least, the Court is unable to decide upon which side the evidence weighs more heavily.

Likewise, the Court is unable to decide upon which side the evidence weighs more heavily with regard to whether any malady was caused by the vaccine in this case.

The Court is not unsympathetic to the plaintiff. Swine flu products liability litigation is complicated and extremely diffi-

cult, and counsel for the plaintiff and the United States have presented their respective positions with exceptional skill and ability and are to be commended for their efforts. The simple fact is that, at least in the present case, no one can ever ascertain what afflicted the plaintiff or what caused it. Inferences and possibilities abound, but this is no substitute for proof, which is obviously not available due to the state of scientific research at present, under the circumstances of the instant case.

For the above reasons, judgment will be entered in favor of the United States and plaintiff's complaint dismissed.

*Conclusions of Law*

1. The burden of proof is upon the plaintiff to establish the *prima facie* elements of a cause of action in a civil case based upon negligence and products liability by a preponderance of the evidence.

2. A preponderance of the evidence is the greater weight of evidence which, when weighed with that opposed to it, has more convincing force and is more probably true and accurate. If the evidence appears to be equally balanced, or if it cannot be said upon which side it weighs more heavily, plaintiff has not met his or her burden of proof.

3. Plaintiff has failed to establish by a preponderance of the evidence that she suffered from GBS, or that the governmentally administered vaccination was the proximate cause of whatever affliction she subsequently developed.

A separate judgment in accord with this memorandum opinion will be concurrently entered.